STATE OF MAINE
CUMBERLAND, ss.

BUSINESS & CONSUMER COURT
LOCATION: Portland
Docket No. BCD-AP-11-12
JcN-CuM-3/11/2013  ✓

)
BANGOR CAR CARE, INC.,                    )
                                          )
            Petitioner,                   )
                                          )
v.                                        )      **DECISION AND ORDER**
                                          )      (Motion for Summary Judgment)
STATE TAX ASSESSOR,                       )
                                          )
            Respondent                    )
                                          )

Respondent State Tax Assessor moves for summary judgment against Petitioner Bangor

Car Care, Inc. (BCCI) on Petitioner's appeal of the Assessor's reconsideration decision assessing

sales and use tax against Petitioner.[1] The Assessor disallowed certain bad debt sales tax credits

the Petitioner had claimed on uncollectible car loans for the audit period from April 1, 2006, to

March 31, 2009. *See* 36 M.R.S. § 1811-A (2012).[2] The Assessor asserts in its motion that BCCI

cannot show that it is entitled to bad debt sales tax credit in addition to those already allowed for

the audit period. The Assessor, therefore, asks the Court to enter summary judgment in its favor.

## FACTUAL BACKGROUND

The facts are largely undisputed, except where noted. During the relevant time period,

BCCI was a registered Maine retailer of motor vehicles. (S.S.M.F. ¶¶ 2, 5; O.S.M.F. ¶¶ 2, 5.)

For most of BCCI's vehicle sales during this period, BCCI entered into installment sale contracts

with its customers, which were assigned to one of three financing corporations. (S.S.M.F. ¶ 11;

---

[1] The portion of the assessment for Petitioner's failure to remit tax on its sales of extended warranty contracts after September 20, 2007, the date when those sales became a taxable service, are not at issue in this appeal.

[2] The statute was amended during the audit period, but not in any way that affects the present appeal. *See* P.L. 2007, ch. 438, § 49 (effective Sept. 20, 2007).

O.S.M.F. ¶ 11.) The vast majority of BCCI's installment sale contracts at issue were assigned to Persian Acceptance Corp. (Persian) on a recourse basis. (S.S.M.F. ¶ 33; O.S.M.F. ¶ 33; A.S.M.F. ¶¶ 146-47; R.S.M.F. ¶¶ 146-47.) Although the parties debate whether the assignments were recourse or limited recourse, the substance of the agreement between BCCI and Persian required BCCI to reimburse Persian if a customer defaulted on the loan. (S.S.M.F. ¶¶ 33-34; O.S.M.F. ¶¶ 33-34.)

The agreement between BCCI and Persian was somewhat complicated, but typically worked as follows. At the time of each sale, Persian advanced to BCCI a portion of the amount financed by the customer. (S.S.M.F. ¶ 18; O.S.M.F. ¶ 18.) BCCI retained any down payment or trade-in vehicle provided by the customer. (S.S.M.F. ¶ 22; O.S.M.F. ¶ 22.) Customers made their payments directly to Persian, not to BCCI. (S.S.M.F. ¶ 29; O.S.M.F. ¶ 29.)

In determining the advance, Persian first discounted the amount financed for every contract by 15%; this discount was an amount that BCCI would never receive, even if the customer paid Persian in full. (S.S.M.F. ¶¶ 19-20; O.S.M.F. ¶¶ 19-20.) Persian also deducted 15% of the amount financed and placed it into a fund called the "dealer reserve," which was controlled by Persian. (S.S.M.F. ¶ 21; O.S.M.F. ¶ 21.) The amount financed less the discount and less the dealer reserve was called the gross advance or base advance. (S.S.M.F. ¶ 24; O.S.M.F. ¶ 24.) If a customer defaulted, BCCI had to reimburse Persian for the gross advance amount with certain adjustments discussed *infra*. (S.S.M.F. ¶ 33; O.S.M.F.¶ 33.)

The gross advance was not, however, the amount of funds advanced to BCCI. Persian deducted another 20% of the amount financed and placed it in a loss reserve fund that it controlled. (S.S.M.F. ¶ 25; O.S.M.F. ¶ 25.) The loss reserve was used to reimburse Persian when customers defaulted. (S.S.M.F. ¶ 26; O.S.M.F. ¶ 26.) The gross advance less the loss

reserve and less a flat $50 acquisition fee was the amount actually advanced to BCCI on the transaction. This was called the "net advance." (S.S.M.F. ¶¶ 27-28; O.S.M.F. ¶¶ 27-28.) In the aggregate, the net advance is 50% of the amount financed less $50. If the customer paid in full, Persian would return the amount of the dealer reserve on the contract to BCCI, unless BCCI owed money to Persian for other transactions. (S.S.M.F. ¶ 22; O.S.M.F. ¶ 22.) If the customer did not pay in full, BCCI forfeited some or all of the dealer reserve depending on how much the customer had failed to pay. (S.S.M.F. ¶ 23; O.S.M.F. ¶ 23.)

Persian required that the customers purchase VSI insurance to protect Persian if the vehicle was damaged or destroyed prior to complete payment. (S.S.M.F. ¶¶ 30-31; O.S.M.F. ¶¶ 30-31.) Although the customer often in fact financed the VSI premium, the amount was not part of the taxable sales price of the vehicle, nor was it included in the calculation to determine BCCI's net advance. (S.S.M.F. ¶¶ 32, 41, 44; O.S.M.F. ¶¶ 32, 41, 44.)

A default by a customer of its payment obligation to Persian triggered a reimbursement obligation for BCCI to Persian: BCCI reimbursed Persian for the gross advance, less the principal payments by the customer reduced by a portion of the 15% discount, plus the VSI premium and any costs for repossessing the vehicle. (S.S.M.F. ¶ 33; O.S.M.F. ¶ 33.) This net reimbursement amount was called the chargeback, and was paid out of the loss reserve. (S.S.M.F. ¶ 34; O.S.M.F. ¶ 34.) Upon default, Persian calculated what it called "Ending Principle [sic] Bal. @ Repo." (EPB @ repo), or the remaining principal of the amount financed that had not been paid to Persian. (S.S.M.F. ¶ 60; O.S.M.F. ¶ 60.) This figure does not include any proceeds from the disposition of the repossessed vehicle or insurance proceeds for a damaged vehicle; Persian calculated those amounts separately as "Other Proceeds."

3

(*See* S.S.M.F. ¶¶ 60-61; O.S.M.F. ¶¶ 60-61.) The chargeback was typically a smaller figure than the EPB @ repo figure. (S.S.M.F. ¶ 81; O.S.M.F. ¶ 81.)

After a customer default, a third party typically repossessed the vehicle on Persian's behalf, and then one of four scenarios occurred:

> (1) Persian arranged to have the vehicle sold at auction and credited the sales proceeds to BCCI in calculating any chargeback; (2) Persian returned the vehicle to BCCI (in return for the chargeback), and BCCI resold the vehicle at retail; (3) Persian returned the vehicle to BCCI (in return for the chargeback), and BCCI arranged for the vehicle to be sold at auction; and (4) Persian returned the vehicle to BCCI (in return for the chargeback), and BCCI resold the vehicle for scrap value.

(S.S.M.F. ¶ 55; O.S.M.F. ¶ 55.) A fifth scenario rarely happened, in which the vehicle was never recovered and Persian would put in a claim with the insurer and then credit BCCI with any insurance proceeds when calculating the chargeback. (S.S.M.F. ¶ 58; O.S.M.F. ¶ 58.) Similarly, if the vehicle were damaged when repossessed, Persian would put in a claim with the insurer and then credit BCCI with any insurance proceeds when calculating the chargeback. (S.S.M.F. ¶ 57; O.S.M.F. ¶ 57.) There is no information in the summary judgment record about what percentage of the repossessions that fell into each of the five scenarios. (S.S.M.F. ¶¶ 59, 62, 131-35; O.S.M.F. ¶¶ 59, 62, 131-35.)

When Maine Revenue Services (MRS) began auditing BCCI in 2009, BCCI did not provide MRS with any books or records regarding its accounts receivable; BCCI had always relied on Persian's accounts as its own. (S.S.M.F. ¶¶ 73, 87; O.S.M.F. ¶¶ 73, 87; A.S.M.F. ¶ 139; R.S.M.F. ¶ 139.) Upon completion of the audit, MRS issued three notices of assessment to BCCI for its three locations:

|  | Sales and use tax | Interest | Penalty | Total per location |
|---|---|---|---|---|
| Brewer | 442,490.71 | 101,429.58 | 92,188.01 | **$636,108.30** |
| Lewiston | 16,801.54 | 3,556.32 |  | **$20,357.86** |

4

| Westbrook | 3,061.20 | 550.14 | | $3,611.34 |
|---|---|---|---|---|
| | $462,353.45 | $105,536.04 | $92,188.01 | |

(S.S.M.F. ¶¶ 90-92; O.S.M.F. ¶¶ 90-92.) The assessments resulted from disallowance of bad debt credit claims by BCCI and the failure to remit tax on extended warranty sales contracts after September 20, 2007, the latter of which is not at issue in the present appeal. (S.S.M.F. ¶¶ 94, 104; O.S.M.F. ¶¶ 94, 104.) MRS determined that BCCI's assignment of the installment sales contracts to third parties foreclosed BCCI's ability to satisfy the statutory requirements of 36 M.R.S. § 1811-A. *See Sears, Roebuck & Co. v. State Tax Assessor*, 2012 ME 110, ¶ 10, 52 A.3d 941. (S.S.M.F. ¶ 102; O.S.M.F. ¶ 102.)

BCCI sought reconsideration of the bad-debt tax credit disallowance, and MRS determined that BCCI might be eligible for bad-debt credits if it had assigned the installment sales on a recourse basis, validly charged off pertinent sales accounts as worthless, and otherwise satisfied § 1811-A. (S.S.M.F. ¶ 105; O.S.M.F. ¶ 105.) During the audit period, BCCI filed sales tax returns on a monthly basis. (S.S.M.F. ¶ 6; O.S.M.F. ¶ 6.) When claiming bad debt sales tax credits during the audit period, BCCI itemized the vehicle sales it had made during the month at issue and the bad debt charge offs for that month to support its bad debt tax credit claims. (S.S.M.F. ¶¶ 7-8; O.S.M.F. ¶¶ 7-8.) BCCI did not keep its own records of each installment sale for determining the amount of bad debt to charge off; BCCI relied on the documents provided to it by Persian. (S.S.M.F. ¶¶ 72, 74; O.S.M.F. ¶¶ 72, 74.)

Nevertheless, BCCI no longer had any of the documents upon which it relied upon during the audit period when preparing its monthly sales tax returns and charge offs. (S.S.M.F. ¶ 73; O.S.M.F. ¶ 73.) Persian ultimately prepared spreadsheets for MRS with details regarding contracts BCCI assigned to Persian. (S.S.M.F. ¶¶ 79, 108-09; O.S.M.F. ¶¶ 79, 108-09.) From those documents, it became clear that when BCCI filed its sales tax returns, it usually claimed as

5

a bad debt for each vehicle the amount that Persian had calculated as the EPB @ repo. (S.S.M.F. ¶¶ 75, 115; O.S.M.F. ¶¶ 75, 115.) MRS determined that BCCI's reliance on this term substantially overstated the amount of possible bad debt charge offs because, among other reasons, the EPB @ repo figure did not take into account any proceeds received for the vehicle after repossession and included amounts that were not subject to sales tax in the first instance. (S.S.M.F. ¶ 116; O.S.M.F. ¶ 116.) After months of work and reconciliation based on the Persian documents and independent research, MRS found $25,632 in bad debt tax credits that BCCI was entitled to based on the amount that could be charged off as worthless accounts during the audit period. (S.S.M.F. ¶¶ 119-23; O.S.M.F. ¶¶ 119-23.) MRS calculated the amount of worthless accounts by taking the vehicle's sale price and deducting any trade-in and down payment, principal loan payments made by the customer,[3] insurance proceeds received after repossession, and resale price of the repossessed vehicle. (S.S.M.F. ¶ 124; O.S.M.F. ¶ 124.) The MRS Appellate Division accepted the recommendations in issuing two different reconsideration decisions for the Brewer and Lewiston locations. (S.S.M.F. ¶¶ 128-30; O.S.M.F. ¶¶ 128-30.) BCCI brought this timely appeal. *See* 36 M.R.S. § 151 (2011).

## DISCUSSION

The taxpayer has the burden of proof in an administrative appeal of a reconsideration decision of the Assessor. 36 M.R.S. § 151.

> When a party seeks review in the Superior Court of a decision issued by the Assessor upon reconsideration, the court must "make a de novo determination of the merits of the case" and "shall make its own determination as to all questions of fact or law, regardless of whether the questions of fact or law were raised during the reconsideration period."

---

[3] Loan principal payments were determined by dividing the customer's monthly payment into principal and interest components using an 18% interest rate, which Persian said was the applicable rate. (S.S.M.F. ¶ 126; O.S.M.F. ¶ 126.)

6

*Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 6, 17 A.3d 667 (quoting 36 M.R.S. § 151). Here, the Assessor has moved for summary judgment against the taxpayer. "Summary judgment is appropriate when there is no genuine issue of material fact that is in dispute, and the moving party is entitled to judgment as a matter of law." *Luker v. State Tax Assessor*, 2011 ME 52, ¶ 7, 17 A.3d 1198 (quotation marks omitted).

The bad debt sales tax credit statute states:

> The tax paid on sales represented by accounts charged off as worthless may be credited against the tax due on a subsequent return filed within 3 years of the charge-off, but if any such accounts are thereafter collected by the retailer, a tax must be paid upon the amounts so collected.

36 M.R.S. § 1811-A. The purpose of the statute is "to give a credit on a sales tax paid on a charge sale, the payment for which was not subsequently made." *Linnehan Leasing v. State Tax Assessor*, 2006 ME 33, ¶ 19, 898 A.2d 408 (quotation marks omitted). To prove it is entitled to take the bad debt sales tax credit, BCCI must show it is 1) a retailer 2) that paid the sales tax on the initial sale, 3) charged off the debt on its books as worthless, and 4) applied for the credit within three years of the charge-off. *See Sears*, 2012 ME 110, ¶ 11, 52 A.3d 941; *accord Linnehan Leasing*, 2006 ME 33, ¶ 3, 898 A.2d 408; *DaimlerChrysler Servs. N. Am. v. State Tax Assessor*, 2003 ME 27, ¶¶ 9-16, 817 A.2d 862.

The present case involves whether BCCI charged off the appropriate amount of bad debt and thus is entitled to bad debt sales tax credit on those amounts.[4] The Assessor contends that

---

[4] The Law Court recently has reaffirmed that the retailer who takes the bad debt sales tax credit must also have charged the debts off as uncollectible. *See Sears*, 2012 ME 110, ¶ 11, 52 A.3d 941. Thus, an assignment of installment sales accounts from a retailer to a financing company does not qualify the retailer to take the bad debt sales tax credit upon default by the customer because the retailer does not charge off the uncollectible debt. *See id.*; *accord DaimlerChrysler*, 2003 ME 27, ¶ 12, 817 A.2d 862.

The facts of the present case differ in that BCCI assigned accounts to Persian on a recourse basis, thus obligating itself to Persian should the consumer fail to fulfill its obligations. (S.S.M.F. ¶¶ 33-34; O.S.M.F. ¶¶ 33-34; A.S.M.F. ¶¶ 146-47; R.S.M.F. ¶¶ 146-47.) The parties do not dispute that the recourse assignment permits BCCI, upon sufficient proof, to take advantage of the bad debt sales tax credit. Thus, the Court presumes that the

7

BCCI cannot show that it is entitled to any more bad debt sales tax credit than MRS has allowed in the reconsideration decision. The manner by which the bad debt credit should be calculated is central to the parties' dispute. The Assessor maintains that to compute properly the amount of the bad debt credit to which a party in BCCI's position, one must take into account proceeds from the disposition of or the value of the repossessed vehicles. (*See* S.S.M.F. ¶ 1; O.S.M.F. ¶ 1.) To that point, the Sales, Fuel & Special Tax Division of MRS published an instructional bulletin (Bulletin No. 29) regarding the deduction for bad debts, which explains the appropriate deduction for losses after repossession. It provides, in relevant part:

> **a.     Loss on Repossession.** Repossession of property sold under a conditional sales contract does not necessarily create a basis for deduction. Tax is due on the original sale, and tax is also due on the eventual sale of the repossessed property.
>
> The retailer may compute the net loss to be charged off by deducting the amount of all applicable payments and credits from the original sale price upon which tax was paid. "Applicable payments and credits" includes the trade-in allowance, if any; the amount of the down payment, if any; and the amount of any subsequent payments applied to the principal. It does not include the amount of any payments applied to finance charges. *In computing the net loss, the retailer must deduct the fair market value or actual subsequent sale price of the repossessed property* reduced by any direct material or labor costs incurred to recondition the property for resale.

(Beaulieu Aff. Exh. A (hereinafter, "Bulletin No. 29") at 4 (emphasis added)). The Assessor computed the net loss as set forth in Bulletin No. 29 when it determined the amount of BCCI's worthless accounts for the audit period. (*See* S.S.M.F. ¶ 124; O.S.M.F. ¶ 124.)

BCCI, citing the language of section 1811-A, asserts that it need not take into account proceeds from repossessed property in calculating the amount of its bad debt. BCCI contends that the plain language of the statute contemplates a two-step process: 1) a tax credit for the full

---

assignment of accounts to Persian does not affect BCCI's ability to utilize section 1811-A and does not address that issue further.

amount of uncollectible debt without consideration of proceeds from collateral; and 2) should collateral be sold and funds "thereafter collected by the retailer," a later, separate payment of tax.

BCCI's argument ignores the fact that a retailer is only entitled to a bad debt credit for accounts charged off as *worthless*. A worthless account is one that has become uncollectible. *See Linnehan Leasing*, 2006 ME 33, ¶ 19, 898 A.2d 408. Fundamentally, an account is not worthless if there is collateral securing the debt because the collateral can still be collected or repossessed and the proceeds applied for payment or partial payment of the debt. Even if the creditor/taxpayer does not sell the collateral immediately after repossession, the creditor/taxpayer should be required to account for the value of the repossessed collateral when it determines the bad debt credit to which it is entitled. Otherwise, in BCCI's case, BCCI could sell a repossessed vehicle again under similar financing terms, and realize another bad debt credit in the event of a default without ever accounting for the value of the vehicle. Such a result defies common sense, and is inconsistent with the purpose of the statute that permits parties to benefit from the bad debt tax credit. The Court thus concludes as a matter of law that the correct calculation to determine the bad debt sales tax credit is that set forth in Bulletin No. 29, which requires deduction of proceeds for repossessed property. *Cf. DaimlerChrysler*, 2003 ME 27, ¶ 13, 817 A.2d 862 (affording deference to MRS Bulletin No. 29 to the extent of ambiguity in section 1811-A).

As mentioned above, this was the primary issue in dispute between the parties. BCCI concedes that it used a figure to calculate bad debt sales tax credit that did not take into account any proceeds received upon disposition of the repossessed vehicle. Instead, BCCI used the EPB @ repo calculated by Persian. (S.S.M.F. ¶¶ 60-61, 75, 115; O.S.M.F. ¶¶ 60-61, 75, 115.) The EPB @ repo figure does not represent the amount of an account that has become uncollectible; it

represents the amount of principal a customer did not pay. Use of the amount that the customer did not pay as the amount of the bad debt, without accounting for the value of the repossessed vehicles and/or the proceeds from the sale of the repossessed vehicles will result in an overstatement of uncollectible debts and the sales tax credits for bad debts.

BCCI as the taxpayer has the burden of proving that it is entitled to more bad debt sales tax credits than the Assessor has allowed. 36 M.R.S. § 151. BCCI maintains that the chargeback spreadsheets that the Assessor cites in support of its request for summary judgment are not the same documents that BCCI relied upon when it filed its sales tax returns. BCCI particularly challenges the accuracy of the "Other Proceeds" column. (S.S.M.F. ¶¶ 63, 79; O.S.M.F. ¶¶ 63, 79.) However, BCCI did not create and maintain its own record of each installment sale in order to determine the amount of bad debt to charge off; instead, BCCI relied on the documents provided to it by Persian. (S.S.M.F. ¶¶ 72, 74; O.S.M.F. ¶¶ 72, 74.) Further, BCCI no longer has any of the documents that it contends it relied upon during the audit period when it prepared its monthly sales tax returns and charge offs. (S.S.M.F. ¶ 73; O.S.M.F. ¶ 73.) In other words, even if the manner by which BCCI contends the bad debt credit should be computed is correct, BCCI has no documents to verify its calculations.

Rather than produce any supporting documentation, BCCI attempts to rely on Persian's records. Persian's records do not, however, provide a basis upon which BBCI could prevail on its challenge to the Assessor's determination. That is, BCCI has not produced any documentary evidence from which a fact finder could reasonably conclude that BCCI is entitled to a greater bad debt sales tax credit than that allowed by the Assessor. BCCI's reliance on Persian's records is simply insufficient. Similarly, BCCI's reliance on the testimony of Glenn Geiser, BCCI's former manager, regarding the value of and disposition of some of the repossessed vehicles is

10

unavailing. Mr. Geiser does not specify any particular vehicle that BCCI repossessed, and does not correlate a repossessed vehicle to a particular sale. Mr. Geiser's testimony does not, therefore, generate any evidence upon which a fact finder could reasonably rely to calculate a greater amount of bad debt sales tax credit than that allowed by the Assessor.[5]

In short, because BCCI has failed to provide the Court with facts on an essential element of its claim to the bad debt sales tax credit, the Assessor is entitled to summary judgment. *See Luker*, 2011 ME 52, ¶ 16, 17 A.3d 1198 (concluding a taxpayer's failure to provide evidence of an essential element on summary judgment precluded judgment in its favor). Accordingly, the Court grants summary judgment in favor of the State Tax Assessor.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this Decision and Order into the docket by reference.

Date: 3/11/13

_____
Justice, Maine Business & Consumer Docket

---

[5] BCCI contends that the "central dispute of material fact before this Court is whether the sales tax returns that BCC filed every month during the Audit Period accurately accounted for its bad-debt sales tax credits. A secondary, and inherently dependant (sic), dispute of material fact before this Court is whether the State Tax Assessor's audit and subsequent adjustment thereto have been accurate. Even to the extent that neither is 100% accurate, a dispute of material fact would exist as to which was more accurate." (Pet. Opp., p. 2). While BCCI has correctly identified the parties' dispute in this case, the mere existence of a dispute does not preclude the entry of summary judgment. Otherwise, summary judgment would not be appropriate in any case. The issue is whether the moving party (i.e., BCCI) can present facts upon which a fact finder could reasonably rely to controvert the material facts cited by the Assessor in support of summary judgment. As explained above, BCCI has produced no admissible evidence upon which a fact finder could so rely.

Entered on the Docket: 3.15.13
Copies sent via Mail __ Electronically ✓

**BCD-AP-11-12**

**Bangor Car Care, Inc.**        v.        **State Tax Assessor**

Christopher Largay, Esq.
293 State Street, Ste One
Bangor ME  04401

Thomas Knowlton, AAG
Office of the Attorney General
6 State House Station
Augusta ME  04333